The appellant, Cynthia Y. Woods, was convicted of theft by deception in the first degree,[1] in violation of § 13A-8-2(2), §13A-8-3(a) Code of Alabama 1975. The appellant was sentenced to 20 years in prison. The appellant raises six issues on appeal.
The state's evidence tended to show that during March 1991 and February 1992, the appellant extorted approximately $60,000 from Virginia Sanderson. Mrs. Sanderson testified that she became acquainted with the appellant and her husband in March 1991 when the appellant offered to help Mrs. Sanderson move some boxes into her house if Mrs. Sanderson would pay her. Mrs. Sanderson said that she paid her for helping with the boxes, and that she gave her some extra money to buy groceries. Afterwards the appellant asked Mrs. Sanderson to pay some of her medical bills. Mrs. Sanderson said that she paid the bills. The appellant visited Mrs. Sanderson regularly over the next two months, each time asking for money to pay her bills. In June 1991, Mrs. Sanderson told the appellant that she could no longer afford to provide financial support.
Mrs. Sanderson further testified that in July 1991, the appellant called her and told her that she owed money to a small loan operator, to whom she referred as a "loan shark." Mrs. Sanderson said that the appellant told her she was frightened of what he would do if she did not repay the money. Mrs. Sanderson gave the appellant $2,000 to repay the loan. Over the next eight months, the appellant called Mrs. Sanderson every few days demanding money, which she said she needed to repay amounts she had borrowed from the "loan shark." Whenever the appellant contacted Mrs. Sanderson, a person who identified himself as the "loan shark" would also be on the phone and would threaten Mrs. Sanderson if she did not give the appellant money. According to Mrs. Sanderson, this man, the alleged loan shark, threatened the appellant's life, Mrs. Sanderson's life, and the lives of Mrs. Sanderson's children. *Page 318 
From August 1991 until mid-January 1992, Mrs. Sanderson wrote checks payable to the appellant or her husband totalling $21,148. Starting in mid-January, Mrs. Sanderson gave the appellant cash. From mid-January 1992 until mid-February 1992, Mrs. Sanderson wrote checks to cash for approximately $10,000. On January 28, 1992, the victim took out a loan for $10,000. That same day, Mrs. Sanderson gave the appellant $10,000 in cash. On February 3, 1992, the appellant called Mrs. Sanderson and told her that she needed $35,000 to repay the loan shark. She accompanied Mrs. Sanderson to the bank so that Mrs. Sanderson could withdraw a $40,000 certificate of deposit. After paying the penalty for early withdrawal, Mrs. Sanderson received a cashier's check in the amount of $39,000, which she attempted to cash. Because of the amount of the check, however, Mrs. Sanderson was unable to cash the check. Someone at the bank called police. Mrs. Sanderson testified that when the police became involved, the appellant instructed her to burn the cancelled checks that she had written to the appellant.
The manager of the main branch of AmSouth Bank where Mrs. Sanderson had obtained the $39,000 cashier's check called Investigator Charles Moore of the Huntsville Police Department. The bank manager informed Moore of the situation and Moore went to the AmSouth branch at which Mrs. Sanderson was trying to cash the cashier's check. Moore spoke with the appellant and with Mrs. Sanderson at this time. Once Investigator Moore became involved, the appellant's demands for money ceased and the $40,000 was replaced in Mrs. Sanderson's account.
The appellant was later questioned by the police. She told Investigator Moore that she had received financial support from Mrs. Sanderson and that she had received between approximately $50,000 and $60,000 from Mrs. Sanderson during the period from March 1991 to February 1992. The appellant also stated that a loan shark was involved, and she gave the man's name and a description to the police. She told the police that the loan shark had made her perpetrate a scam so that Mrs. Sanderson would continue giving them money. After questioning, the appellant was allowed to leave the police station. The police attempted to locate a man matching the appellant's description of the loan shark, but they never located anyone matching that description.
Bank employees who were familiar with both Mrs. Sanderson's and the appellant's bank account records testified as to the amounts of money withdrawn from Mrs. Sanderson's accounts and the amounts of money deposited in the appellant's bank accounts. These witnesses said that the withdrawals from Mrs. Sanderson's accounts were synchronous with deposits in the appellant's bank accounts.
 I
The appellant initially contends that the trial court erred in denying her motion for a mistrial. She contends that the prosecutor made comments during closing arguments that called the jury's attention to the fact that she did not testify and thereby violated her constitutional right to remain silent.
The record does not contain the state's closing arguments. As stated in Bethune v. State, 542 So.2d 332 (Ala.Cr.App. 1989):
 " '[T]he record should disclose with reasonable certainty what was said in the court below, in order that the appellate court may review it.' Flowers v. State, 269 Ala. 395, 397, 113 So.2d 344
(1959); McClary v. State, 291 Ala. 481, 482-83, 282 So.2d 384 (1973). 'It is well established that objectionable remarks should be fully quoted, or substantially so, in an objection to improper argument.' Jones v. State, 460 So.2d 1382, 1383
(Ala. 1984). The appellate court must be able to ascertain with reasonable certainty what was said before improper argument may be the predicate for a reversal. Jones, supra."
542 So.2d at 334.
Here, the record does contain the appellant's objection to the state's arguments and the trial court's response to that objection:
 "(Mr. Chadbourne [prosecutor] continued closing argument, during which the following occurred:) *Page 319 
 "Mr. Webster [defense counsel]: Your Honor, I object to the reference to take the stand. My client's under no burden to take the stand and counsel is attempting to put that burden on my client. I think it's improper.
 "Mr. Gladden [defense counsel for co-defendant]: I also join in that objection.
 "The Court: Ladies and Gentlemen, no defendant is required to take the stand in any case because the defendant has no burden of proof in a case. The burden rests entirely upon the State of Alabama, and as I will instruct you more fully in just a moment, that is a fact from which you may draw no inferences whatsoever. Do you all understand?"
Further, at the end of the trial, the appellant renewed her objection concerning the comments made by the state during closing argument, and the following occurred:
 "Mr. Webster [defense counsel]: I have no objections to the charge, your Honor. I would like at this time, which is the first opportunity we've had, to renew an objection made to the statement made by counsel during closing argument and move for a mistrial on the basis of my interpretation of what he said, which I interpreted to be placing a burden on my client. And, for the record, my recollection of what he said was something to the effect that intent can be shown when someone confesses or testifies. My position is that places an undue emphasis on the failure of my client to testify, and it's an improper comment on her failure to testify in this case."
(Emphasis added.) The jury was then recalled, and the trial court stated:
 "The Court: All right, ladies and gentlemen, I want to say a few other things to you and then send you back to deliberate.
 "First, during closing argument, Mr. Chadbourne [the prosecutor] was talking to you about some matters that I have instructed you on and that is the concept of intent, . . . intent being one of those words like knowingly which refers to a state of mind, the mental attitude that existed within the mind of a person when an act was done or a statement was made, and he was stating to you his argument that intent, as I said, rarely can be proven by direct evidence. Usually, it can only be proven by circumstantial evidence.
 "Unfortunately, in defining how rarely intent can be proven directly — because, as he said, you can't open up a person's head, rummage around in the brain, pull out a particular piece of brain matter and say, 'Ah-ha, here's intent' — that, normally, you can only prove intent directly when a person tells you that and you find their statement to be a credible one. Well, that causes me concern for this reason and I'm going to have to talk to you very straight, and then I'm going to have to ask you whether you're going to give me your assurance that you will not allow this to affect your thinking in any way."
(Emphasis added.)
The substance of the comments contained in the above excerpts from the record provide sufficient specificity for this court to review the comments on appeal. Jones v. State,460 So.2d 1382, 1383 (Ala. 1984).
After the court polled the jury, it continued to instruct the jury on the applicable law concerning the state's burden of proof and the presumption that the appellant is innocent until proven guilty. The trial court informed the jury that the appellant could testify if she wanted but that she had a right to remain silent. At the end of this instruction, the trial court polled the jury to determine if all the jurors understood the instructions and if they could abide by them in the jury deliberation process. None of the jurors expressed any doubts concerning the instruction.
Our review of the limited record leads us to conclude that the trial court did not err to reversal in denying the appellant's motion for a mistrial. The record reveals that the prosecutor made the allegedly improper comments when he was defining "intent" for the jury during closing arguments. There was not any specific reference made in the comments to the appellant and so no error was committed. The trial court admirably attempted to salvage the trial. The prosecutor's comments flirted with reversible error but did not achieve it. *Page 320 
" 'The trial judge is in the best position to determine whether the prejudicial effects of an improper remark can be eradicated by instructions to the jury, and his determination should be accorded great deference.' " Jackson v. State,629 So.2d 748 (Ala.Cr.App. 1993), quoting Hannah v. State,518 So.2d 182, 185 (Ala.Cr.App. 1987). Also, "[i]n determining whether the curative instructions have eradicated the prejudice caused by the improper remark, each case must be considered on its own facts and circumstances." Jackson, 629 So.2d at 752. See also Whitt v. State, 370 So.2d 736 (Ala. 1979).
The trial court did not err in denying the appellant's motion for a mistrial.
 II
The appellant next contends that the trial court erred in denying her motion to suppress her pre-trial statements. Specifically, she argues that the statements were taken while she was illegally detained by the police and that the statements made were involuntary.
"All extrajudicial confessions are presumptively involuntary and thus inadmissible, although the presumption may be overcome by evidence that the confession was voluntarily given and that the accused was informed of his Miranda [v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] rights before making any statements." Staten v. State, 547 So.2d 603, 606
(Ala.Cr.App. 1988), rev'd on other grounds, 547 So.2d 607 (Ala. 1989).
When is a person in "custody"?
 "The United States Supreme Court in California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) articulated 'the standard by which "custody" is to be judged.' Davis [v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985)]. In its opinion, the Supreme Court stated that 'although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' California v. Beheler, supra, 463 U.S. at 1125, 103 S.Ct. at 3519-20 (quoting [Oregon v.] Mathiason, supra, 429 U.S. [492] at 495, 97 S.Ct. [711] at 714 [50 L.Ed.2d 714
(1977)]). See also Primm [v. State, 473 So.2d 1149, 1158 (Ala.Cr.App.), cert. denied, 473 So.2d 1149
(Ala. 1985)].
 "A determination of 'custody' is not based on 'the subjective evaluation of the situation by the defendant or the police officers.' Davis, supra at 171. Where there has not been a formal arrest (as here), an objective test is used to determine whether the suspect's freedom of action has been restricted by the police in any significant manner. Davis, supra at 171; [United States v.] Miller, [587 F. Supp. 1296, 1299 (W.D.Pa. 1984)]; Warrick [v. State, 460 So.2d 320, 322 (Ala.Cr.App. 1984)]; Hall [v. State, 399 So.2d 348, 351
(Ala.Cr.App. 1981)]. 'The only relevant inquiry is how a reasonable man in the suspect's position would have understood his position.' United States v. Jonas, 786 F.2d 1019, 1022 (11th Cir. 1986) (quoting Berkemer v. McCarty, 468 U.S. 420, [442], 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984)).
 " 'Pertinent factors to be considered include (1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. United States v. Crisco, 725 F.2d 1228, 1231 (9th Cir.), cert. denied, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); [United States v.] Booth, 669 F.2d [1231] at 1235 [(9th Cir. 1981)]; United States v. Curtis, 568 F.2d 643, 646 (9th Cir. 1978).'
 "United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985)."
Hooks v. State, 534 So.2d 329, 347-48 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050,109 S.Ct. 883, 102 L.Ed.2d 1005 (1989).
In deciding whether an accused is in custody, the court must consider the "totality of the circumstances." Bradley v. State, *Page 321 
494 So.2d 750, 758 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772
(Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385,94 L.Ed.2d 699 (1987). "[A] voluntary trip to the police station for questioning does not implicate the [F]ourth [A]mendment."Cox v. State, 489 So.2d 612, 618 (Ala.Cr.App. 1985), quotingUnited States v. Webster, 750 F.2d 307, 321 (5th Cir. 1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 2341,85 L.Ed.2d 855, 856 (1985).
The record reveals that before the trial court received the statements into evidence, the trial court held a suppression hearing. During this hearing, Investigator Moore testified that he visited the appellant at her house and asked her to come to the station to help with his investigation. Moore testified that the appellant agreed to come to the police station voluntarily. Upon arriving at the police station, the appellant was placed in an office, was read the Miranda warnings, and was questioned by Moore. After questioning, the appellant was placed in another room while Moore questioned the appellant's husband. Moore testified that the appellant was free to leave the police station at any time. The appellant testified that Moore told her that she could voluntarily come to the police or that he would force her to come. She also said that she did not feel free to leave.
Here, the court was faced with a credibility question for the court to reconcile. There was evidence presented that supported the court's ruling that the appellant was not illegally detained.
 "When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible, his decision will not be disturbed on appeal 'unless found to be manifestly contrary to the great weight of the evidence.' Williams v. State, 456 So.2d 852, 855 (Ala.Cr.App. 1984)."
Ex parte Matthews, 601 So.2d 52, 53 (Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).
Regardless of whether the appellant was in custody when she gave her statements, the police at that time had probable cause to arrest her. Moore had previously talked with Mrs. Sanderson and had learned that she had given the appellant approximately $60,000.
 "Probable cause to arrest requires 'knowledge of facts and circumstances which are reasonably trustworthy and which would lead a prudent man to believe that the accused had committed the offense [for which he is arrested].' Blanco v. State, 515 So.2d 115, 119 (Ala.Cr.App. 1987)."
Dixon v. State, 588 So.2d 891, 896 (Ala.Cr.App. 1990), rev'd,588 So.2d 903 (Ala.), on remand, 588 So.2d 908 (Ala.Cr.App. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 904,116 L.Ed.2d 805 (1992).
Therefore, the trial court did not err in denying the appellant's motion to suppress her statements.
The appellant also contends that the trial court erred in receiving her statements into evidence before the state proved the corpus delicti of the crime for which she was charged.
The general rule in Alabama is that a defendant's statement cannot be received into evidence until proof of the corpusdelicti has been established independent of the statement. Ticev. State, 386 So.2d 1180 (Ala.Cr.App.), cert. denied,386 So.2d 1187 (Ala. 1980). However, "if the corpus delicti is not proven prior to the admission of the confession, then such proof after its admission will cure the error." Marcus v. State,568 So.2d 342 (Ala.Cr.App. 1990).
Before receiving the appellant's statements, the state elicited testimony from Mrs. Sanderson that she had paid approximately $60,000 to the appellant. She testified that she had given a majority of the money to the appellant because she believed that the appellant was indebted to a loan shark. The state also offered testimony that established that the appellant's bank account had increased by approximately $60,000 over the same period she supposedly was paying the money Mrs. Sanderson had given her to the alleged loan shark. After the statements were received into evidence, Investigator *Page 322 
Moore testified that he was unable to find any person by the name and matching the description of the alleged loan shark.
Therefore, the state presented ample evidence before and after the statements were received, to prove the corpus delicti independent of the appellant's statements. Thus, the trial court did not err in admitting the appellant's statements into evidence.
 III
The appellant next argues that the trial court erred when it denied her motion for a judgment of acquittal. Specifically, the appellant argues that the state did not prove that she did not intend to repay the money to Mrs. Sanderson.
 "To make out a case for violation of the Code of Alabama 1975, § 13A-8-3 and § 13A-8-2, theft by deception in the first degree, the state was required to prove three things: 1) that the appellant knowingly obtained the property of [Mrs. Sanderson]; 2) that the appellant obtained [Mrs. Sanderson's] property by deception; and 3) that the appellant intended to deprive [Mrs. Sanderson] of [her] property. Loper v. State, 469 So.2d 707, 710
(Ala.Cr.App. 1985)."
Donovan v. State, 548 So.2d 1087, 1089 (Ala.Cr.App. 1989).
From the testimony recited above, we conclude that there was sufficient evidence to present the case to the jury. Whether the appellant intended to deprive Mrs. Sanderson of this money or whether the appellant intended to repay Mrs. Sanderson was a question for the jury to decide. McMurphy v. State,455 So.2d 924 (Ala.Cr.App. 1984). "[F]raudulent intent need not be proven by direct substantive evidence but rather can be inferred from conduct of the defendant and the circumstances of the case."McMurphy v. State, 455 So.2d at 928. See also Cottonreeder v.State, 389 So.2d 1169 (Ala.Cr.App. 1980). Furthermore, the fact that the appellant repaid or attempted to repay does not change the fact that she deceived Mrs. Sanderson in order to deprive her of her money. See McElroy v. State, 571 So.2d 353
(Ala.Cr.App. 1990).
There was sufficient evidence from which a jury could conclude that the crime of theft by deception in the first degree had occurred. Therefore, the trial court did not err in denying the appellant's motion for a judgment of acquittal.
 IV
The appellant contends that the trial court erred in denying her motion to quash the jury venire. Specifically, she argues that the number of blacks on the venire was not representative of the number of blacks in Madison County. She contends that this disparity violated her right to a jury pool that is a "fair cross-section" of the community.
The record shows that the population of Madison County is 20 to 21 percent black. The prospective juror list included 40 persons, 5 of whom were black. Thus, 12.5 percent of the jury venire was black.
The "fair cross-section" requirement was addressed by the United States Supreme Court in Duren v. Missouri, 439 U.S. 357,364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586-87 (1979). The United States Supreme Court stated:
 "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to excluded is a 'distinctive' group in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
439 U.S. at 364, 99 S.Ct. at 668. See also Jones v. State,586 So.2d 304 (Ala.Cr.App. 1991).
The burden of establishing a violation of the "fair cross-section" requirement was not met in this case. The underrepresentation of blacks on the venire was not shown to be the result of systematic exclusion. The trial court pointed out to the appellant that the jury venire was chosen at random by a computer programmed for that task. Thus, we *Page 323 
can infer that such selection does not result in systematic exclusion of any specific group of people. Id.
The trial court did not err in denying the appellant's motion to quash the jury venire.
 V
The appellant next argues that the trial court erred in receiving into evidence photocopies of checks Mrs. Sanderson had made out to the appellant. First, she contends that there was a variance between the charge and the proof adduced at trial. Specifically, the appellant argues that she was charged with the taking of "currency" by deception, not with the taking of "checks" by deception. She contends that the checks, therefore, are inadmissible as proof of the charges against her. Second, the appellant contends that admission of copies of the checks violates the "best evidence rule."
In support of her first contention, the appellant relies onEx parte Airhart, 477 So.2d 979 (Ala. 1985), in which the Alabama Supreme Court held that when the charge involves "currency" and the proof relies on "checks," there was a fatal variance and the "checks" were inadmissible. However, the present cause can be distinguished from Airhart.
In Airhart, the defendant was charged with theft of lawful "currency" of the United States of America. The state presented "checks" that the defendant had taken as evidence that the defendant was guilty of the crime charged. The state did not offer evidence showing that the defendant had taken any "currency" from the victim.
In the present cause, the appellant was charged with theft by deception of lawful "currency" of the United States. The state, in its effort to prove the charges, offered evidence of "checks" the victim wrote to the appellant and evidence of "currency" that the appellant had taken from the victim. Thus, unlike Airhart, the state did not rely solely on "checks" to prove the charges against the appellant.
After reviewing the record, we are of the opinion that the trial court did not err in receiving the checks into evidence. The record shows that Mrs. Sanderson had refused to give the appellant any more money after the initial outlay of checks. Soon after, the appellant approached Mrs. Sanderson with the alleged loan shark problem. Mrs. Sanderson was then instructed to pay the appellant in cash. Thus, the state's evidence showing that the appellant had received checks from Mrs. Sanderson before receiving currency from the victim was highly material and relevant in showing that the appellant had the intent to commit the crime of theft by deception. See C. Gamble, McElroy's Alabama Evidence, § 69.01(5) (4th ed. 1991). The fact that the appellant had previously received checks from the appellant was a circumstance for the jury to consider in determining whether the appellant had the intent to commit the crime of theft by deception in the first degree.
Second, the appellant contends that photocopies of the checks were inadmissible because the admission of copies violated the best evidence rule.
A review of the record shows that Mrs. Sanderson initially had possession of the cancelled checks that she received in her bank statements. Later, after the police became involved, the appellant called Mrs. Sanderson and instructed her to burn the cancelled checks. The copies introduced by the state were obtained from the bank.
Once a party offers evidence that the original piece of evidence was destroyed, then secondary evidence may be introduced in its place. See C. Gamble, McElroy's AlabamaEvidence, § 215.01 (4th Ed. 1991). The proponent of the secondary evidence must prove only that he did not destroy the evidence fraudulently with an intent to prevent it from being used as evidence. McElroy's, § 215.01.
In the instant case, Mrs. Sanderson destroyed the checks at the appellant's direction. Thus, the copies of the checks were admissible to replace the destroyed originals.
The trial court did not err in admitting the copies of the checks into evidence. *Page 324 
 VI
Last, the appellant contends that the trial court erred in allowing two witnesses to testify after they had remained in the courtroom and had observed Mrs. Sanderson's testimony.
The record shows that the state was unaware of the presence of the two witnesses in the courtroom until after Mrs. Sanderson testified. The appellant and the state stipulated that the witnesses or the prosecution had not willfully violated the Rule.
The witnesses in question were a loan officer and a bank teller who had helped Mrs. Sanderson acquire $10,000 on January 28, 1992. Mrs. Sanderson had previously testified that on January 28, 1992, she went to the bank to cash in a $10,000 certificate of deposit so that she could give the money to the appellant. She testified that the bank suggested that she take out a loan instead to avoid paying the penalty for cashing in the certificate of deposit early. The two witnesses testified that they helped Mrs. Sanderson get the $10,000 loan.
Whether a witness who has violated the court's sequestration order may thereafter testify is a matter that ordinarily lies within the sound discretion of the trial court. Wilson v.State, 584 So.2d 921 (Ala.Cr.App. 1991). Absent any intentional violation of the "rule" by a witness or a party we hold that the trial court did not abuse its discretion. Pope v. State,367 So.2d 998 (Ala.Cr.App. 1979). No reversible error was committed in this connection.
For the foregoing reasons, the judgment is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] The appellant's husband, Santonyo Woods, was tried with the appellant. The jury found Mr. Woods not guilty.